ARCHIE PLANK v. R. J. BROWN PETROLEUM COMPANY, a Corporation, Appellant.—61 S. W. (2d) 328.

Division One, June 12, 1933.*

---

*NOTE: Opinion filed at October Term, 1932, April 20, 1933; motion for rehearing filed; motion overruled at May Term, June 12, 1933.

*Holland, Lashly & Donnell, Wm. H. Allen* and *W. E. Moser* for appellant.

*Everett Hullverson* and *Staunton E. Boudreau* for respondent.

1154

FERGUSON, C.—This action was instituted by plaintiff to recover damages for alleged personal injury and disease which he claims to have sustained while employed by defendant petroleum company. The theory of the action is that plaintiff's alleged injuries and consequent illness or disease directly arose out of and resulted from conditions maintained and permitted by defendant company in violation of Section 13252, Revised Statutes 1929, which requires:

"Every employer of labor in this state engaged in carrying on any work, trade or process which may produce any illness or disease peculiar to the work or process carried on, or which subjects the employee to the danger of illness or disease incident to such work, trade or process, to which employees are exposed, shall for the protection of all employees engaged in such work, trade or process, adopt and provide approved and effective devices, means or methods for the prevention of such industrial or occupational diseases as are incident to such work, trade or process."

Plaintiff had verdict and judgment for damages in the sum of $17,500 and defendant appealed.

As necessary to a discussion of the assignments of error made by appellant and to an understanding, at the threshold, of the nature of this case we shall first summarize the facts developed by plaintiff's evidence with the reasonable inferences arising therefrom. Defendant company as its name indicates was engaged in some branch of the petroleum business, the exact nature of which does not appear. However as a part of the work carried on at the company plant in the city of St. Louis metal drums or containers were painted. Plaintiff then of the age of twenty-five years and of sound health went to work for the company at the St. Louis plant in "June or July, 1925." About three weeks after he entered upon employment at defendant's plant he was assigned to the work of painting drums and continued regularly at that kind of work until the 2nd day of the following January (1926), some six or seven months, when on account of the increasing severity of the illness herein complained of he was compelled to quit work. The process or method prescribed by defendant for doing this work was to place the drum upon a frame or box-like rack or platform across which two shafts extended upon each of which, at a properly spaced distance apart, were two narrow wheels or discs. The shafts were so connected with a motor that when in operation they revolved. The drum was placed upon and between the wheels or discs and as the shafts revolved the drum was caused to slowly turn and as it did so the workman in charge of the work sprayed the drum with paint by means of a spraying appliance operated by compressed air and referred to as a spray gun. A hose attachment connected with the spray gun was inserted into the paint container. By mixing and dissolving paint in paste form with gasoline a thin liquid paint suitable for spraying was obtained. In thus making up the liquid paint three gallons of gasoline was used to make five gallons of paint. The paint was ejected from the spray gun in the form of a vaporized spray, "like a fog." To properly perform the work plaintiff when operating the spray gun was required to stand in front of and close to the slowly revolving drum and while the spraying was in progress the air about him was heavily charged with the gasoline fumes which he constantly inhaled. While the room in which plaintiff worked was approximately thirty-six feet in length, twelve feet wide with ceiling eight feet in height, the spraying machinery was located, according to plaintiff's testimony, in a "kind of boxed off place, a very narrow place with drums and other things packed in there." Plaintiff worked steadily and continuously at this spraying work day after day during the entire time and sprayed between "seventy and eighty drums" daily. During the summer months, windows and doors being open and thus affording adequate ventilation to carry away the fumes, plaintiff did not notice any ill effects from the gaseous fumes. During the fall

and winter months however plaintiff states that the doors and windows were kept "closed all the time" and the fumes were not properly carried away so that he was, during the whole of each working day, exposed to and inhaled the fumes which permeated the air about him as he carried on the spraying operation. Plaintiff's testimony tended to show the poisonous effect of gasoline fumes and plaintiff points to Section 13253, Revised Statutes 1929, as specifically applying to the conditions under which he was working. Said section reads:

"The carrying on of any process, or manufacture, or labor in this state in which antimony, arsenic, brass, copper, lead, mercury, phosphorus, zinc, their alloys or salts or any poisonous chemicals, minerals, acids, fumes, vapors, gases, or other substances, are generated or used, employed or handled by the employees in harmful quantities, or under harmful conditions, or come in contact with in a harmful way, are hereby declared to be especially dangerous to the health of the employees." [See Cropper v. Titanium Pigment Co., 47 Fed. (2d) 1038.]

After plaintiff had worked about four months at the spraying job he began to suffer, almost daily, from headaches and dizzy spells. The next development was a cramping in the legs and arms, "tearing pains in the muscles of the legs and arms." He began vomiting after meals and "coughing and spitting all the time" and would "cough up a thick, green colored phlegm" and during the last month preceding his collapse on January 2, 1926, he suffered "burning pain" in the chest, "coughed practically all the time . . . could not sleep or rest for coughing and aching." On January 3, Plank was unable to return work, was confined to his home and called a physician, Dr. Simms, who on the following day directed that he be placed in a hospital. Dr. Simms testified that he found plaintiff "suffering with quite a deal of pain, coughing, irritation, spitting mucous, pain through chest and body and the muscles of the arms and legs . . . he was drowsy . . . couldn't use his arms very well" and he was of the opinion at the time that plaintiff "had some kind of poisoning." From the symptoms appearing and certain tests made, including a "white blood count," Dr. Reilly who was in charge of the case from the time plaintiff entered the hospital, diagnosed his condition at the time of admission as "poisoning of some kind." The two physicians who examined and treated plaintiff gave it as their opinion that his condition as observed by them and in view of the history of the case was the result of poisoning caused by the inhalation of the gasoline fumes with which he was brought into contact in carrying on the spraying process or work. The medical testimony tended to show the injurious effects which might and likely would result from the day to day inhalation of

gasoline fumes; one likely ill effect being the irritation and inflammation of the lungs and respiratory organs resulting in weakened and lowered resistance to infection rendering the person so affected most susceptible to pneumonia and kindred diseases. On the third day after entering the hospital pneumonia developed. Plaintiff was in the hospital ten weeks during which time it became necessary to ''cut away part of the ninth and tenth ribs to drain pus'' for the purpose of relieving an abscessed condition of the lungs. Plaintiff testified that he was not able to again do any work until two and one-half years after leaving the hospital when he went to work at a tobacco factory where he worked about four months and that at the time of the trial he was working for a dairy company where he had been employed about three months; that at the time of the trial he suffered pain in the chest, had difficulty in breathing, was subject to fever in the evenings and coughing ''in the mornings and at night'' and had never regained lost weight. Plaintiff stated, that he did not know there was ''anything dangerous about breathing the gasoline fumes'' but that as his physical ailments became more pronounced he complained ''several different times'' to the foreman ''that there was something bothering me and I figured it was so many fumes in there. I thought it was burning me;'' that at such times the foreman would say, ''go ahead; that I would get used to it and it wouldn't bother me.'' Plaintiff offered evidence to the effect that no notices, ''warning about fumes of any character'' or ''how to avoid the effect of these fumes'' were posted in the room where plaintiff worked; that no masks or respirators of any character'' were furnished and that respirators of an approved type suitable and effective to provide a constant supply of fresh air and protect the workman against such fumes were obtainable and in use. The testimony that notices were not posted was offered as tending to show a violation of Section 13264, which requires that:

''. . . the employer shall post in a conspicuous place in every room or apartment in which any such work or process is carried on, appropriate notices of the known dangers to the health of any such employees arising from such work or process, and simple instructions as to any known means of avoiding, so far as possible, the injurious consequences thereof. . . .''

Plaintiff's evidence further describing the spraying stand or rack was that such stand or rack was partially enclosed or screened by a hood arising at the back and extending over the platform leaving however the front and sides open with the drum fully exposed and that from an opening in the back a pipe or flue, in which was a small electric fan, extended upwardly to a window; one pane of the window glass had been removed to permit the gas and fumes, which this contrivance was designed, and supposed, to carry off, to

be emitted. Plaintiff's evidence tended to show that the flue and ventilating fan did not effectively remove the fumes from the place where plaintiff worked; that the hood did not extend over the drum as far as it should to catch and arrest the fumes; that while one pane of glass had been removed to make an outlet for the flue that the flue was so large it could not be extended through this outlet and extended over and against one of the other panes of glass which had not been removed so that some of the fumes which were caught up and carried through the flue were deflected back inside the room and into the air about the operator of the "spray gun;" that if the sash in the window was not completely closed the fan would "suck air from the outside" bringing back into the room and about the operator some of the fumes discharged through the flue and that "usually" drums or barrels were so stacked outside this building and near and about this window as to impede or obstruct the discharge of fumes through the flue. Defendant's evidence tended to show that the "fan and flue device" were effective in "carrying off the fumes" and that the "spray gun was the type ordinarily used" in that kind of work. It was admitted that the notices prescribed by Section 13264, Revised Statutes 1929, were not posted.

The action is based upon an alleged violation of the occupational disease statutes as the proximate cause of plaintiff's illness and the injury to his health alleged in the petition. The petition is lengthy and a discussion of the assignments of error which defendant (appellant) makes does not, we think, require that it be set out in full. Both in general and specific language, following the terms and provisions thereof, a violation by defendant of Sections 13252, 13253 and 13264, Revised Statutes 1929, is alleged. In the same manner a violation of Sections 13254, 13255 and 13258, Revised Statutes 1929, are also charged. The three last sections, respectively, require the employer, to provide "working clothes to be kept and used exclusively by such employees;" to "cause all employees who come into direct contact with the poisonous agencies or injurious processes referred to in Section 13253 to be examined" by a reputable physician "as often as once every calendar month;" and to provide dressing rooms and lavatories for employees. While some evidence was offered touching these three assignments same were abandoned by plaintiff as ground of recovery and the cause was tried and submitted and confined by the instructions to the alleged violation of Sections 13252 and 13264, supra, requiring the employer "carrying on any work, trade or process . . . which subjects the employee to the danger of illness or disease incident to such work, trade or process, to which employees are exposed" to "adopt and provide approved and effective devices, means or methods" for the protection of such employees and the "prevention of such industrial or occupational diseases as are

incident to such work, trade or process" and requiring the posting of notices.

█ Appellant's first contention is that the petition does not state any cause of action under the occupational disease statutes in that it "alleges plaintiff contracted pneumonia while in defendant's employ" but "fails to allege that pneumonia is a disease incident or peculiar to the work or process in which he was employed." The petition repeatedly in express, as well as general language, charges that the painting or spraying process or work, in which plaintiff was engaged, exposed and subjected plaintiff to the inhalation of poisonous and injurious fumes which produced illness and disease peculiar and incident to that kind of work or process and having, as we have noted, enumerated at length and in detail alleged violations of and specific failure, in various respects, to conform to and comply with the occupational disease statutes concludes with the allegation "that by reason of defendant's negligence as aforesaid" plaintiff "was poisoned, made sick and contracted inflammation and irritation and poisoning of the lungs and directly contracted pneumonia;" that "as a direct result of said irritation, inflammation and conditions resulting therefrom plaintiff was caused to undergo an operation," etc., and that "plaintiff's lungs and chest, and parts thereof were inflamed and infected." As we have pointed out ample evidence is found in the record tending to show that in a paint spraying process such as that in which plaintiff was engaged poisonous fumes would form and be disseminated and that unless "effective devices, means or methods" were employed to remove and carry off the fumes, or otherwise protect the employee carrying on the operation from inhalation of such fumes by means of a respirator or other suitable appliance, such employee would be exposed and subjected to the danger of poisoning, impairment of health, irritation and inflammation of the respiratory organs and weakened and reduced resistance with consequent susceptibility to pneumonia and like diseases and that such condition and results were incident to such work or process. Though by a narrow and strict construction of the language of the petition it may seem that it does not expressly and specifically charge that the illness alleged to have resulted from the poisonous fumes was such as is incident to that particular kind of work or process since the sufficiency of the petition to state a cause of action was at no time attacked by motion or demurrer and is for the first time questioned here the objection appellant makes must be disallowed "if by reasonable intendment, or by fair implication from facts stated, or if by most liberal construction" such allegation may be "got at by inference." [East St. Louis Ice and Cold Storage Co. v. Kuhlmann, 238 Mo. 685, 702, 142 S. W. 253, 258.] █ "The general rule obtains that, in determining the sufficiency of the petition after ver-

1160

dict and judgment, we must indulge every reasonable intendment in favor of the petition'' (Baugher v. Gamble Construction Co., 324 Mo. 1233, 26 S. W. (2d) 946), and ''if a matter material to plaintiff's cause of action be not expressly averred in the petition, but same be necessarily implied from what is expressly stated therein, the defect is cured by verdict. . . . This doctrine is founded upon the presumption that the plaintiff has proved on the trial the facts insufficiently averred.'' [State ex rel. Schroeder v. Haid, 328 Mo. 807, 41 S. W. (2d) 789.] Reading the petition as a whole, according to it every reasonable intendment and fair inference necessarily implied from what is expressly stated and in view of the facts proved, appellant's objection must be overruled. ■ What we have said relative to the sufficiency of the proof to make a case under Section 13252, supra, disposes of appellant's second contention that ''plaintiff's evidence failed to bring the case within the occupational disease statutes because he did not produce testimony showing that the disease of pneumonia is incident or peculiar to the work or process in which he was employed.'' The evidence shows the illness which immediately and directly resulted from the exposure to and inhalation of the poisonous fumes was such as is incident to that work or process and the causal connection between that illness, producing as it did a weakened and lowered resistance of the lungs and respiratory tract to infection, and the consequent pneumonia.

■ Appellant claims error in the giving of plaintiff's instruction numbered one. The instruction first and at some length makes a somewhat abstract statement of law declaring, in substantially the language of Sections 13252 and 13264, supra, the duty enjoined upon an employer by said sections, ''to adopt and provide for the protection of all employees engaged'' in any work or process in which ''poisonous chemicals, vapors, gases or fumes were generated, employed or handled'' by such employees ''in harmful quantities, or under harmful conditions or with which the employees came in contact in a harmful way and which were likely to produce illness or disease peculiar to said work or process or which subjected the employee to the danger of illness or disease incident to such work or process, approved and effective devices or means for the prevention of such diseases, if any, as were incident to such work or process.'' These generalizations are followed with the direction: ''And if you find that plaintiff was employed by defendant as a sprayer, spraying a mixture which was injurious to the health of said plaintiff or which might cause plaintiff to suffer any such disease, if you so find, then it was the duty of defendant to provide approved and effective means or devices for the prevention of such disease or illness incident to such work, if you so find, and to post in a conspicuous place in any room where any work or process, if any, injurious to the health of plain-

tiff was carried on, appropriate notices warning plaintiff and other employees of the danger to health arising from said work and instructions as to how to avoid injurious consequences thereof, if any." The instruction then continues as follows: "Therefor if you find and believe from the evidence that plaintiff was so employed by defendant and while engaged in his said duties he was caused to breathe and come in contact with gasoline fumes or gases incident to the said work there, if you so find, and that defendant failed to provide the above means for the prevention of illness or sickness likely to be produced thereby, if you so find, and that defendant could have avoided or prevented sickness to plaintiff, if any, by providing all or any of the above means or devices, if you so find, and that defendant failed to do so, if you so find, and that plaintiff as a direct result of such failure, if any, was caused to become ill and sick" etc., ". . . as an incident of said work or process then your verdict shall be in favor of the plaintiff and against defendant." While the instruction is very general, unnecessarily states abstract matter and contains surplusage which has no application to the ultimate finding required to authorize a verdict for plaintiff it does, in the language of the statute, predicate defendant's liability upon a finding by the jury that under the facts of the case it was the duty of the defendant to adopt and provide approved and effective means or devices for the protection of plaintiff against the dangers to health incident to the spraying operation or process and that defendant failed to provide such means or devices. It will be noted that the instruction advises the jury of a duty (under Section 13264, supra) on the part of defendant to post notices but seems to be merely an abstract statement of a statutory requirement without making application thereof to the instant case, plaintiff's right to recover being predicated solely upon the violation of the provisions of Section 13252, supra, as the proximate cause of his illness and impaired health. In view of the pleading and evidence offered covering the failure to post notices the jury might have been led by the declaration in the instruction relating to the posting notices to have considered the failure to do so as a basis of a verdict against defendant while the instruction does not predicate recovery upon such ground as a proximate cause of plaintiff's illness. The criticism of the wording of the instruction which imposes liability if defendant "could have avoided or prevented sickness to plaintiff . . . by providing all or any" approved and effective means or devices seems to have merit and might be considered together with the instruction as a whole as being too general, broader than the pleading and proof and as giving the jury a roving commission. As the case is, for reasons hereinafter stated, to be remanded for another trial the instruction can perhaps, upon another trial, be more aptly drawn so as to be more specific and concise and

be restricted and applied to the facts of the case thereby obviating the criticism of it in its present form as being too abstract and general and as tending to likely confuse and mislead the jury. The respondent suggests, and well reasons, that in view of the very favorable instruction given at defendant's request defendant could not likely have been prejudiced by plaintiff's instruction in that defendant's instruction so explicitly narrows and limits the issue as to render the broad and general statements found in plaintiff's instruction harmless. Defendant's instruction reads:

"The court instructs the jury that plaintiff claims in this case that defendant caused plaintiff to work as operator of the paint-spraying appliance mentioned in the evidence, and that as a direct result of said work plaintiff inhaled fumes and vapors and other substances, and that the inhalation thereof caused plaintiff to contract pneumonia. In reference to said charge the court instructs the jury that if you believe and find from the evidence that the paint-spraying device mentioned in the evidence was a standard device, and one in general use by parties or concerns spraying paint, and that same was equipped with a flue and a fan; and if you further believe and find from the evidence that defendant, in furnishing said appliance for plaintiff, exercised ordinary care to furnish plaintiff a reasonably safe appliance wherewith to work, then and in that case plaintiff is not entitled to recover and you will find your verdict for defendant."

■ Appellant challenges plaintiff's given instruction on the measure of damages. The first clause of the instruction reads: "The court instructs the jury that if, under the evidence and the other instructions of the court, you find in favor of the plaintiff, then in assessing his damages you will allow him such sum as you believe and find from the evidence will fairly and reasonably compensate him." Then follow six paragraphs enumerating the elements which the jury may consider in arriving at the amount of damages to be assessed:

1. "For such pain and suffering of body and mind" which plaintiff "has suffered."
2. "For such pain and suffering of body and mind . . . plaintiff is reasonably certain to suffer in the future."
3. "For such permanent injuries, if any, plaintiff will suffer by reason and on account of the injuries, if any, sustained on the occasion in question." (This is the portion of the instruction attacked.)
4. For loss of earnings.
5. For future loss of earnings.
6. For sums of money plaintiff became obligated to pay for medical attention.

The testimony of plaintiff and that of Dr. Reilly, an excerpt from

which we shall presently set out, as to plaintiff's condition at the time of the trial and that same was traceable to and proximately connected with the original illness or injury with the reasonable probability arising therefrom that such condition would so continue in, at least, the immediate future, was ample to warrant consideration by the jury of future pain, suffering and loss of earnings, submitted by paragraphs 2 and 5. as elements of damage, but as to paragraph 3, relating to permanent injury, we are constrained to hold the evidence insufficient to warrant the inclusion of the permanency of plaintiff's injury as an element which the jury could properly consider in assessing damages. The only testimony on this phase of the case is that of Dr. Reilly as follows:

"Q. And what do you diagnose his condition to be now, doctor? A. He has got a chronic inflammatory infection of both lungs, *which very frequently becomes tuberculosis;* he has lost considerable weight; he has got a cough, and he *gives the general appearance of a patient with pulmonary tuberculosis.*

"Q. Is that your opinion, that he has that at this time? A. *That is what I am very much afraid of.*

"Q. Doctor, what would you say as to his probable length of life, taking everything you know about this case into consideration?

"Mr. LASHLY: I object to that; that would be mere speculation. I object to it; that would just be a guess.

"THE COURT: I will overrule the objection. To which ruling of the court the defendants, by counsel, did then and there duly object and except at the time and still continue to object and except.

"Q. Answer the question, please, doctor. A. Decidedly shortened.

"Q. Decidedly shortened? A. Yes.

"Q. Doctor, would it be— A. And *if it is tuberculosis* it is problematic, a year and a half, three or five years; it all depends.

"Q. Would a change in climate tend to improve that or lengthen his life, doctor? A. Yes, sir."

Viewed in the light most favorable to plaintiff the substance and extent of this testimony is that the inflammatory lung infection which Dr. Reilly states existed at the time of the trial "very frequently becomes tuberculosis;" that plaintiff at that time had the appearance of a person "with pulmonary tuberculosis;" that the doctor was "afraid" of that development and "if it is tuberculosis" length of life is "problematic." The testimony is of too equivocal a nature to be considered as an expression of medical opinion or conclusion that plaintiff was at the time of the trial afflicted with pulmonary tuberculosis. But if, by implication, it be accepted as sufficient to constitute an opinion that plaintiff was then so afflicted we find nothing in this testimony, or in the evidence, indicating that such disease had so taken hold upon plaintiff and progressed to such a stage that it could not likely be arrested and stayed by ordinary methods of

treatment but had become and was an incurable condition or of a permanent character. The most that can be said of the effect of the testimony is that it indicates a possibility or likelihood that pulmonary tuberculosis might develop. Nor does the use of the term "chronic" connote permanency of a condition. The common acceptation of the term as well as the definitions thereof found in standard dictionaries is, in speaking of a disease, that such disease is of long standing or duration and as contrary to acute. "To justify a recovery for apprehended future consequences, there must be such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury. To say of a thing it is permanent means that it will continue regardless of a contingency or fortuitous circumstance." [Lebrecht v. United Rys. Co. of St. Louis (Mo.), 237 S. W. 112.] ■ Proof of a condition which may cause future trouble is not necessarily proof of a permanent injury, the former may persist after the trial but not continue to exist permanently while the latter is a physical or mental impairment or disability which will last throughout life, and there is a distinction between damages which may reasonably result in the future and damages allowable as for a permanent injury. [Bante v. Wells (Mo. App.), 34 S. W. (2d) 980; Stahlberg v. Brandes (Mo. App.), 299 S. W. 836; Colby v. Thompson (Mo. App.), 207 S. W. 73.] To recover damages for permanent injury the permanency of the injury must be shown with reasonable certainty and while absolute certainty is not required mere conjecture or likelihood, or even a probability, of such injury will not sustain the allowance of damages therefor. [8 R. C. L. p. 470; 17 C. J. p. 1035; Lebrecht v. United Rys. Co., supra; Burnison v. Souders, 225 Mo. App. 1159, 35 S. W. (2d) 619; Colby v. Thompson, supra; Bante v. Wells, supra.] The testimony in this case does not meet the test of reasonable certainty, of the permanency of the injury, required and was not therefore sufficient to sustain and warrant the instruction authorizing the jury to allow damages based upon proof of a permanent injury. "A jury should not be accorded the liberty of finding a fact in the absence of proof of that fact. Epecially is this true if the fact found constitute cause for increasing the amount of the damages." [Lebrecht v. United Rys. Co., supra.] ■ The inclusion of paragraph 3 in the instruction was error and we cannot say that the submission of the element of permanent injury in the instruction did not "materially affect the merits." Since it is obviously impossible to determine what the jury may have allowed as for permanent injury and cure the error by *remittitur* the judgment must be reversed and the cause remanded. It is so ordered. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.